**UNITED STATES DISTRICT COURT**
**FOR THE**
**MIDDLE DISTRICT OF PENNSYLVANIA**

ROBERT L. HOLBROOK,                    :
                                       :
            Plaintiff,                 :
                                       :   **CIVIL NO. 3:CV-03-0033**
       v.                              :
                                       :   **(JUDGE VANASKIE)**
SCOTT WALTERS, <u>ET</u> <u>AL</u>.,        :
                                       :
            Defendants.                :

**M E M O R A N D U M**

**I.        Introduction**

On January 6, 2003, Plaintiff Robert E. Holbrook, a state inmate formerly

incarcerated at the State Correctional Institution at Huntingdon, Pennsylvania, ("SCI-

Huntingdon"), brought this civil rights action <u>pro se</u> , alleging he is the victim of retaliation due to

his filing of prison grievances and his membership in the Nation of Islam ("NOI").[1]  Named as

defendants are the Secretary of the Department of Corrections ("DOC"), Jeffrey Beard, and the

following members of the SCI-Huntingdon corrections staff: Superintendent Kenneth Kyler;

Deputy Superintendent A. Scott Williamson; Unit Manager Scott Walters; Unit Manager

Kenneth Hollibaugh; Counselor Arvil Lovett; and Inmate Program Manager Raymond Lawler.

---

[1]  Holbrook is currently housed at SCI-Greene, a maximum security prison in
Waynesburg, Pennsylvania.

Holbrook alleges that Walters retaliated against him by fabricating information portraying him as an anti-white extremist and a threat to the security of the institution.  As a result, he was placed in Administrative Custody ("AC") in SCI-Huntingdon's Restricted Housing Unit ("RHU") pending a transfer to another facility.   (Dkt. Entry 1, Complaint, and Dkt. Entry 2, Preliminary Statement.)  Defendants Beard, Kyler, Williamson, Hollibaugh, Lawler and Lovett allegedly violated his First Amendment rights when they "acted in cooperation" with Walters after being informed that Walters' actions were retaliatory.  (Dkt. Entry 2, Claim for Relief.)  Presently before the Court is Defendants' Motion for Summary Judgment.  (Dkt. Entry 79.)  Because it is clear that Defendants would have placed Holbrook in AC status and transferred him from SCI-Huntingdon irrespective of his protected activities, the Motion for Summary Judgment will be granted.

II.        Factual Background

        A.  The Fruit of Islam

              According to documentation submitted by Holbrook in opposing the summary judgment motion, NOI is the most prominent organization within the Black Muslim movement. (Dkt. Entry 94, Exhibits in Support of Plaintiff's Declaration in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Exhibits"), Exh. 34, pp. 82 - 85, Black Muslims, History of the Nation of Islam.)   Plaintiff's Exhibit 34 states that the NOI is a "religious movement based on black separatism" which, over time, has fractured into several groups.  (Id.)  The Fruit of

Islam ("FOI") is affiliated with the NOI.  (Exh. 2 in Supp. of S.J. Mot., Decl. Of Dennis Durant, Dkt. Entry 84-2, ("Durant Decl.") ¶ 12.[2]  The FOI has a para-military structure, with a member's rank signifying his importance in the organization.  (Id. ¶ 13.)

Due to the religious affiliation of the group, the DOC does not classify or monitor the FOI as a Security Threat Group ("STG").  (Id. ¶ 14.)  According to Mr. Durant, however, it is well known that FOI members have a long history of involvement in disruptive and violent activities inside DOC prisons. (Id. ¶ 15.)  Although the FOI is not tracked as a group, the actions of an individual member may be monitored if the inmate is noted as using his position and power within the FOI to engage in significant disruptive behavior, or if the individual's membership in the FOI has been the source for some assaultive behavior.  (Id. at ¶ 16.)  If an inmate while under close supervision exhibits behavior that indicates that he is attempting to organize other inmates for the purpose of disrupting the security of an institution, he may be given AC status.(Id. at ¶ 20.)

It is undisputed that Holbrook is a member of the NOI.  (Dkt. Entry 92, Plaintiff's Decl. ¶ 45.)  Holbrook asserts that he does not belong to the FOI.  (Id. ¶ 46.)

**B.  Holbrook's History within the DOC**

Holbrook was committed to the DOC on February 28, 1991, after pleading guilty

---

[2]Mr. Durant is the Chief of Security for the DOC, and has previously served as "Intelligence Captain" at a DOC facility.  (Id., ¶¶ 1-2.)

to first degree murder in the Philadelphia County Court of Common Pleas.  He is serving a life sentence for his involvement in the 1990 stabbing of a woman.  (Exh. 1 in Supp. of S.J. Mot., Decl. Of William Scott Walters, Dkt. Entry 84-2, ("Walters Decl."), ¶ 8(a).)  He was initially confined at SCI-Camp Hill, but was transferred to SCI-Graterford on June 23, 1992.  (Id., ¶ 8(b).)  While at SCI-Graterford, Holbrook was involved in an incident where four Jamaican inmates were assaulted.  Three inmates were stabbed and a fourth was beaten.  According to a July 23, 1993 memorandum concerning the incident, the fight was part of an ongoing dispute between Jamaican inmates and a splinter group of the FOI regarding profit sharing from illegal drug activity.  (Walters Decl. ¶ 8(c); Exh. C, Investigation of Stabbing in E-Block Yard on 07-05-93.)

During the course of the investigation into this matter, Holbrook reported to staff that he "consider[ed] himself to be a member of the FOI."  (Id., Exh. C.)  Although Holbrook did not receive a misconduct for his involvement in the yard incident, he was in the yard at the time and reported to have a shiny object in his hand, which a witness claims he buried in the yard. The weapon was later recovered by staff.  Holbrook claims his visible injuries after the altercation (cuts on his face, back of his neck, and a puncture wound on his left shoulder) were sustained while playing basketball.  One of the Jamaican inmates assaulted during the incident had punched Holbrook in the mouth the day before the incident in the yard.  (Id.)  Holbrook was placed in SCI-Graterford's RHU under AC after this event.  (Id.)

On December 10, 1993, while in AC, Holbrook received a misconduct for attempting to smuggle three balloons filled with marijuana into the prison.  Plaintiff obtained the drugs from his brother, Zaaron Holbrook, during a visit.  (Walters Decl., ¶ 8(d); Exh. D, Misconduct Report.)  Holbrook was transferred from SCI-Graterford to SCI-Greene.  (Walters Decl., ¶ 8(e)).

From SCI-Greene, Holbrook went to SCI-Huntingdon.  On May 18, 1995, Holbrook was stabbed by two other inmates.  The report of this incident noted that there had been a "serious disagreement within the FOI, to which all three individuals claim[ed] membership."  (Walters Decl., ¶ 8(f); Exh. E, DOC Extraordinary Incident Report.)  Prison officials "determined that Robert Holbrook was attempting to drop his association with the FOI, thus provoking" the attack.  (Id.)

Holbrook was then transferred to SCI-Albion, where he received several class misconducts.  On June 9, 1996, Holbrook allegedly attempted to strike another inmate (Rice) with a sock filled with batteries.  (Walters Decl., ¶¶ 8(g)-(h); Exhs. F and G.)  The Unit Manager of the housing unit reported the matter to the Acting Captain for further investigation.  On July 19, 1996, Rice requested self confinement in protective custody after reporting that Holbrook had assaulted him.  Although Plaintiff did not receive a misconduct for this incident, he was placed in AC status and SCI-Albion staff recommended his transfer to the Special Management Unit ("SMU") "because of his high potential for assaultiveness," and because he had

"demonstrated, through his behavior, that he is a continual threat to others, and he has accumulated an extremely large number of misconducts during his confinement." (Walters Decl., ¶ 8(j), Exhs. I and J.)

Holbrook was transferred to the SMU at SCI-Greene on February 14, 1997.[3] (Id., Exh. J.) ) While in the SMU, Plaintiff received a misconduct for circumventing the mail system by corresponding with an inmate at SCI-Albion without authorization. (Walters Decl., ¶ 8(l), Exh. K.) During this time, Holbrook ordered a publication entitled, "Mental Training of a Warrior." The Publication Review Committee disapproved his receipt of this item because it advocated violence and insurrection or guerilla warfare against the government, and because it contained information regarding the manufacture of explosives, incendiaries, weapons, and escape devices. (Walters Decl., ¶ 8(m); Exh. L.)

Plaintiff was released from the SMU after one year, and transferred to SCI-Frackville on a probationary basis. Holbrook's 90-day probationary status at SCI-Frackville was extended an additional 90 days after he received a Class I misconduct on June 14, 1988, for Possession of Devices for Theft of Cable Services. (Walters Decl., ¶¶ 8(n)-( o); Exh. M.) While at SCI-Frackville, a yellow writing tablet owned by Holbrook was confiscated for "possible gang

---

[3]The SMU is described as a program to handle an inmate whose behavior presents a serious threat to the safety and security of the facility, staff, or other inmates. The program allows an inmate to proceed through less restrictive environments based upon his behavior and ability to adjust to reduced levels of supervision. A successful SMU graduate is then placed on general population status at a designated facility. See http://www.cor.state.pa.us.

related material." (Walters Decl., ¶ 8(p), Exh. N.)  After receiving two additional Class I

misconducts at SCI-Frackville (refusing to obey an order and presence in an unauthorized

area), Holbrook was returned to SCI-Greene's SMU.  (Walters Decl., ¶ 8(q), Exh. O.)

        After completing the SMU program for a second time, Holbrook was transferred

to SCI-Dallas on June 26, 1999.  (Walters Decl., ¶ 8(r).)  Within months of his arrival at SCI-

Dallas, staff learned that Holbrook had been promoted to the rank of Captain in the FOI.

(Walters Decl. ¶ 8(s), Exh. P.)  Based upon this information, staff at SCI-Dallas recommended

that Holbrook be transferred to another institution at the discretion of the DOC Central Office.

(Id.) Holbrook was transferred from SCI-Dallas to SCI-Huntingdon on April 5, 2000.  At the time,

SCI-Dallas was reducing its number of "high-risk" cases.  SCI-Dallas staff identified Holbrook as

"high risk security concern" due to his "repeated organizing efforts, misconduct history" (16

Class I and 4 Class II misconduct reports), the "nature of his current offense," as well as his

recent promotion to Captain within the FOI.  (Walters Decl., Exhs. P and Q; Plaintiff's Exh. 31,

p. 72, Letter from Williamson to Plaintiff re: Transfer Rationale.)

        Upon his arrival at SCI-Huntingdon in April of 2000,Holbrook was assigned to the

housing unit managed by Walters, who concluded that Holbrook presented a possible security

concern and recommended he be monitored closely while in general population.  (Walters Decl.

¶ 6.)  In January 2001, Plaintiff received a misconduct for writing on his cell wall phrases

associated with the FOI: "*Black 2-1* FOI - True Soldiers -".  (Walters Decl., Exh. R.)  He was

assessed the cost of paint and labor to remove the phrase.  (Id.)  In April 2001, Holbrook

received a Class I misconduct after a security search of his cell uncovered a four (4) inch metal

shank concealed in the air vent of Holbrook's cell.  (Walters Decl., Exh. S.)  In June 2001,

institution staff disapproved Holbrook's receipt of a publication he ordered, entitled "Manual of

the Urban Guerilla," finding that it "facilitiate[d] escape and terrorism."  (Id., Exh. T.)

On October 12, 2001, a map of Afghanistan indicating the locations of terrorist

base camps, a picture of Malcolm X, a picture of a "militant," a picture of a Mozambique flag

with an AK47 in the middle, and a book entitled "Comrade George," containing remarks against

the white race, were confiscated from Plaintiff's cell by Officer Diehl.  (Walters Decl., Exh U.)

The officer felt that, given the then-recent attacks on the World Trade Center, the materials

presented a possible security concern and should be considered contraband as it could

demonstrate possible militant support of the terrorists.  Upon review of the materials, Capt.

Fisher directed they be returned to Holbrook.

In December 2001 or January 2002, Holbrook and six other inmates complained

to the DOC Office of Professional Responsibility ("OPR")  about a new female officer on their

block, CO Blattenberger (non-defendant), who was allegedly harassing inmates on the basis of

race.  Holbrook, however, never received a misconduct from this officer.  (Dkt. Entry 2,

Preliminary Statement at ¶ 25.)   Unit Manager Walters, who was not involved in the

investigation, learned of the complaint in late January 2002.  (Defendants' Statement of

Material Facts, Dkt. Entry 83,("DSMF"), ¶ 21.)  Holbrook claims the filing of his OPR complaint "set the retaliatory actions of defendant Walters into action."  (Dkt. Entry 33, Brief in Support of Plaintiff's Motion to Compel.)

In March of 2002, Holbrook and other inmates who filed similar complaints with Holbrook's assistance, allegedly were approached by Walters.   (Dkt. Entry 2, Preliminary Statement at ¶ 35; Dkt. Entry 92, Plaintiff's Declaration at ¶¶ 9 - 12; Dkt. Entry 94, Plaintiff's Exhibits at 6, 7 and 9.)  Inmates John Hall, Michael Seawright, and Desean Prosser claimed that Walters retaliated against them as a result of their OPR complaints by having them transferred from SCI-Huntingdon.  (Id.)

On June 10, 2002, Holbrook submitted a request slip to Walters, seeking an override of his custody level for the exclusive purpose of obtaining employment in the institution's powerhouse.[4]  In his request, Plaintiff touted his previous experience in the SCI-Dallas electronics shop, as well as the fact that he had been misconduct-free for nearly a year. (Walters Decl., Exh. V.)    Inmates in the powerhouse are required to have a low classification level, indicating that they present a commensurate low security risk, as the powerhouse is an important area to the security of the institution.  (Walters Decl., ¶ 20.)  Unit Manager Walters

---

[4] Holbrook's custody level 4 requires his confinement in a maximum security prison. (Dkt. Entry 92, Plaintiff's Decl.,  ¶ 44.)

thought Holbrook's request "strange" since he had previously refused work.[5]  (Id., ¶ 16.)

On or about June 20, 2002, Walters attended an operations meeting where staff were briefed on "the recruitment of inmates in American prisons by radical Islamic groups."  (Id, Walters Decl., ¶ 17.)  Walters then spoke with a corrections officer on his block, CO Hiquet, and the Unit Counselor, Mr. Lovett, regarding Holbrook and his "sudden" interest in the powerhouse.  (Id., ¶ 18.)  CO Hiquet advised Walters that inmates on the unit were aware of Holbrook's interest in obtaining employment in the powerhouse as well as his FOI involvement. (Id. ¶ 19.)  It was rumored that he had recently risen to the rank of Major and was using his FOI affiliation to extort money and goods from inmates on the unit, and that he told other inmates that he "was in the 'American Taliban.'"  (Id., ¶ 21.)

Given Holbrook's sudden interest in a security override to work in a sensitive area of the institution, combined with his long standing refusal to work, his reputed involvement with the FOI, his long history of aggressive behavior, his poor institutional adjustment, and what appeared to be an interest in being associated with the "American Taliban," Walters believed it prudent to advise security staff of Holbrook's actions.  (Id., ¶ 22.)  Walters expressed his concerns in a June 21, 2002 memo to Captain Levy, requesting that  Holbrook be monitored

---

[5]  In December 2000, Holbrook sent staff a notice that he wished to be removed from the institution's sanitation detail and would "no longer report to work."  He wrote that "[i]f it was necessary or required" that he should receive a misconduct for this choice,  staff could "send it down to the block."  (Walters Decl., Exh. V.)

closely or placed in AC.  (Id., ¶ 23 and Exhibit X.)   Walters wrote that "[a] personal interview of

this inmate reveals a deep-seated hatred of authority and ultimately the government that has

endorsed his incarceration for life."  (Id.)  Walters concluded his memorandum to Captain Levy

with the statement that "[t]his information is provided to you for any action you deem

appropriate."  (Id.)

        On June 26, 2002, Major Weaverling requested that Walters draft a DC-141

"Other" report to have Holbrook placed on AC status.  (Walters Decl., ¶¶ 24 - 25.)  Holbrook

was placed in the RHU on June 26, 2002.  (Dkt. Entry 2, Preliminary Statement at ¶ 45.)

        Walters presented the contents of his memo and additional information he had

gathered regarding Holbrook's history and actions since his arrival at SCI-Huntingdon to the

Program Review Committee ("PRC") on July 3, 2002.  (Walters Decl., ¶ 26; Dkt. Entry 94,

Plaintiff's Exhibits, Exh. 32, Walters' First Set of Interrogatory Answers, No. 1.)  The PRC was

comprised of Unit Manager Kenneth Hollibaugh, Corrections Classification & Program Manager

Raymond Lawler, and Deputy Superintendent A. Scott Williamson.  (Walters Decl., ¶ 27.)

Based on the information presented,  the PRC determined that Holbrook posed a threat to the

security of the institution.  (Id.)

        Holbrook challenged his AC placement via the available administrative remedy

procedures.  His appeals were denied by Superintendent Kyler and Chief Hearing Examiner

Bitner.  (DSMF, ¶¶ 37-41.)

After Holbrook's placement in the RHU, Walters learned that Holbrook had filed a complaint with OPR, asserting that Walters had orchestrated Holbrook's AC placement in retaliation for Holbrook's prior OPR complaint concerning CO Blattenberger.  (Walters Decl., ¶ 28.)  On July 11, 2002, Holbrook filed a grievance against Walters, alleging that Walters had falsified information in his file in retaliation for Plaintiff's filing of grievances and informal complaints against the alleged racist behavior of SCI-Huntingdon corrections officers.  (DSMF, ¶ 35; Dkt. Entry 2, Preliminary Statement at ¶ 65.)  Major Weaverling investigated the grievance and found it to be without merit.  (Dkt. Entry 2, Preliminary Statement, Exh. N.)

On August 13, 2002, Walters requested that Holbrook be transferred to a long term segregation unit ("LTSU"), noting that "[a]t this facility [Holbrook's] behavior has included 3 stays in the RHU for conduct infractions including a 4-23-01 misconduct for possession of a homemade weapon," that he was a two time SMU participant, and that his list of separations from other inmates was extensive.  A copy of Walters' June 21, 2002 report was included with the transfer request.  Walters reported that the PRC at SCI-Huntingdon approved Plaintiff for transfer on July 3, 2002.   Walters prepared the transfer request, and stated that, if there was a lengthy waiting list for the LTSU, Holbrook should be transferred to another maximum security facility.  (Dkt. Entry 94, Plaintiff's Exhibits, Exh. 18, Transfer Petition.)  The petition was denied on November 15, 2002.  (Id. at Exh. 19, Transfer Petition.)

In October 2002, OPR issued its findings regarding their investigation into

-12-

Holbrook's complaints.  (Dkt. Entry 94, Plaintiff's Exhibits, at Exh. 24, Summary of OPR Report.)  The report indicated that staff at SCI-Huntingdon viewed Holbrook as "a threat to the institution, [who] . . . has an extreme hatred for the Caucasian race."  (Id.)  The report concluded that the OPR "investigation [had] failed to substantiate" Holbrook's allegations against Deputy Superintendent Williams, Unit Manager Walters or CO Blattenberger.  (Id.)  The report also observed that "the PRC, Counselor Lovett, Superintendent Kyler and Secretary of Corrections Jeffrey Beard all concurred with Unit Manager Walters' recommendation that Holbrook remain in the RHU on AC status pending a transfer to the LTSU because he's definitely a threat to any institution security."  (Id.)

On December 13, 2002, Walters submitted an "administrative transfer request to separate Holbrook from SCIH and to maintain the security of the facility."  Walters referenced the materials confiscated from Plaintiff's cell on October 21, 2001, which he believed "indicated [Plaintiff] was loyal to the Taliban."  Aside from other issues, it also noted Holbrook's AC placement.  (Id. at Exhs. 21 and 22, Transfer Petition.)  The DOC's Central Office denied the request, noting that "possession of terrorist materials is insufficient rationale to jeopardize the security of the facility."  (Id.)

On December 24, 2002, a third transfer petition was submitted based, in part, on the need to separate Holbrook from Walters in light of the unsubstantiated OPR complaint against Walters.  (Id., Exh. 23.)  This petition was granted.  Plaintiff was transferred from SCI-

Huntingdon to SCI-Greene on May 27, 2003.  (DSMF, ¶ 45.)   He was held in SCI-Greene's

RHU in AC until August 21, 2003, when he was admitted to general population.  (Dkt. Entry 94,

Plaintiff's Exhibits, Exh. 29, SCI-Greene 30/60 Day Review.)

**III.        Summary Judgment Standard**

Summary judgment should be granted when "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or

nonexistence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  Id.

All doubts as to the existence of a genuine issue of material fact must be

resolved against the moving party, and the entire record must be examined in the light most

favorable to nonmoving party.  P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 852 (3d

Cir.2006).  The moving party has the burden of showing the absence of a genuine issue of

material fact, but the nonmoving party must present affirmative evidence from which a jury

might return a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 256-57.  Merely

conclusory allegations taken from the pleadings are insufficient to withstand a motion for

summary judgment.  The non-moving party "may not rest upon the mere allegations or denials

-14-

of the ... pleading," but "must set forth specific facts showing that there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 231 - 232 (3d Cir. 2001). Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir.1993). Allegations made without any evidentiary support may be disregarded. Jones v. UPS, 214 F.3d 402, 407 (3d Cir. 2000). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## IV.        Discussion

Holbrook alleges that Walters retaliated against him for filing institutional grievances and an OPR complaint against CO Blattenberger and because of his religious affiliation as a member of the NOI. Plaintiff alleges that Williamson, Lawler and Hollibaugh (members of the "PRC") and Counselor Lovett retaliated against him when they "continued to support and acted in cooperation with Defendant Walters" even after Plaintiff informed them of Walters' retaliatory motives. Superintendent Kyler and Secretary Beard are alleged to have retaliated against Holbrook because they were made aware of Plaintiff's claims of Walters' retaliatory motives and actions via Holbrook's grievances and correspondence, but failed to remedy the situation. (Dkt. Entry 2, Preliminary Statement.)

To establish a Section 1983 retaliation claim, a plaintiff bears the burden of

satisfying three elements.  First, a plaintiff must prove that he was engaged in a constitutionally protected activity.  Rauser v. Horn, 241 F.3d 330, 333 (2001).  Second, a prisoner must demonstrate that he "suffered some 'adverse action' at the hands of prison officials."  Id. (quoting  Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  This requirement is satisfied by showing adverse action "'sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'"  Id. at 333 (quoting Allah, 229 F.3d at 225).  Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him."  Id. at 333-34 (quoting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000).  The mere fact that an adverse action occurs after a complaint or grievance is filed is relevant,  but not dispositive, for the purpose of establishing a causal link between the two events.[6]  See Lape v. Pennsylvania, 157 Fed. Appx. 491, 498 (3d Cir. 2005).

Once Plaintiff has made a prima facie case, the burden shifts to the defendants to prove by a preponderance of the evidence that they "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest."  Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002) (internal quotation and citation omitted).  When analyzing a retaliation claim, it must be recognized that the task of prison administrators and

---

[6] Only where the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, standing alone, support an inference of causation.  Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).

staff is difficult, and the decisions of prison officials require deference, particularly where prison security is concerned.  Rauser, 241 F.3d at 334.

Holbrook plainly presents evidence sufficient to defeat summary judgment on the first two prongs of a retaliation claim.  He was engaged in constitutionally-protected activity, and placement in AC and transfer to another prison are the kind of adverse actions that could deter a reasonable person from exercising First Amendment rights.

However, as to all Defendants other than Walters, Holbrook has failed to present sufficient evidence to raise an inference of a causal link between the adverse actions and his exercise of constitutional rights.  No direct evidence of a retaliatory intent has been presented as to any Defendant other than Walters.  There are no statements indicative of a retaliatory animus attributed to any Defendant other than Walters.  There is no evidence of any agreement to aid Walters in a retaliatory act.  There is no evidence of any antagonistic conduct on the part of any Defendant, other than Walters, directed at Plaintiff.

The mere fact that Secretary Beard and Superintendent Kyler failed to respond favorably to Holbrook's claims of retaliation expressed in his institutional grievances and correspondence does not support an inference that their decisions were motivated by a retaliatory intent.  "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing. . . ."  Lauren W.

v. DeFlaminis, ___ F.3d ___, 2007 WL 851320, at *5 (3d Cir. March 22, 2007). Absent such

proof, the plaintiff must show that causation may be inferred "from the 'evidence gleaned from

the record as a whole' . . . ." Id. Our Court of Appeals recently instructed District Judges to

scrutinize the record on summary judgment motions presented in retaliation cases, explaining:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Id. at 6 (emphasis added).

In this case, Holbrook had long been known to be a member of the NOI and an

officer in the FOI.  His complaint to OPR had been filed months before his placement in AC.

Moreover, his AC confinement occurred shortly after he made a request for a prison job in a

very sensitive area of the institution.  Thus, no inference of causation may be drawn from the

timing of the decision to remove him from general population pending a transfer to another institution.

Neither Secretary Beard nor Superintendent Kyler is alleged to have participated in the initial decision to place Holbrook in AC.  While they may have concurred in the AC placement and eventual transfer to another facility, there is nothing in the record to suggest that they were motivated by an intent to punish Holbrook for exercising constitutional rights. Essentially, Holbrook's claim against these Defendants boils down to a disagreement with their responses to his complaints of Walters' alleged retaliation.  Absent some rational basis for believing that these two high ranking officials would have been motivated to retaliate against Holbrook, rejection of his retaliation claim against Walters does not support an inference that they approved his AC placement in order to retaliate against him for any constitutionally-protected conduct or to punish him because of his religious affiliation.  See Brooks v. Beard, 167 Fed. Appx. 923, 925 (3d Cir. 2006)(holding that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond, to prison grievance did not establish that the officials and administrators were personally involved in underlying allegedly unconstitutional conduct).  As I explained in Alexander v. Forr, No. 3:CV-04-0370, 2006 WL 2796412, at *3 (M.D. Pa. Sept. 27, 2006), "the mere fact that [an inmate's] grievances were rejected or denied does not suffice to warrant an inference that the rejection or denial was retaliatory.  If that were the case, then there would exist a First Amendment retaliation claim

-19-

any time an inmate was dissatisfied with the outcome of the grievance proceedings. . . ." Just because an inmate claims in his grievance that adverse action has been taken against him in retaliation for the exercise of a protected right does not mean that the administrator rejecting the claim has now participated in the retaliatory conduct, especially where, as here, the administrator is presented with evidence supporting the adverse action in question.  In this regard, it is significant that Holbrook has not presented  any evidence of  as to why these supervisory officials should not have relied upon the judgment of the PRC in recommending his continued AC confinement pending an administrative transfer to another facility.

          For similar reasons I find that Holbrook has not sustained a prima facie case of retaliation against Deputy Superintendent Williamson, Unit Manager Kenneth Hollibaugh, Inmate Program Manager Raymond Lawler or Counselor Lovett.  Holbrook's theory of liability against these Defendants is that they "acted in cooperation" with Walters after Holbrook advised them that Walters' actions were retaliatory in nature.  The fact that Holbrook alerted the PRC to his concerns that "Walters had him locked down due to his grievances against staff," and the PRC nonetheless concurred with Walters' security concerns related to Holbrook's continued confinement in SCI-Huntingdon's general population, does not support an inference that they intended to retaliate against Holbrook.  Fatal to Holbrook's claims against these Defendants is his failure to submit any evidence demonstrating that their decision to maintain him in AC status pending transfer was retaliatory in nature, or made for the purpose of

furthering Walters' alleged retaliatory efforts, or based on other impermissible factors.

Defendants state that their decision to detain Holbrook in AC pending his administrative transfer

was due to security concerns.  They were presented with ample evidence to substantiate those

concerns.  Holbrook has not offered any evidence as to why it was unreasonable for these

officials to have relied upon his extensive record in reaching their conclusion that Holbrook

should be held in AC custody pending transfer from SCI-Huntingdon for security concerns.

Moreover, there is no dispute that the request for a transfer and AC placement came only after

Plaintiff, who had declined certain work at SCI-Huntingdon, sought placement in the institution's

power plant.  There is no evidence of some intervening antagonistic conduct between any of

these Defendants and Holbrook.  All Plaintiff has shown is that they exercised their discretion to

support Walters' recommendation based upon all the information presented to them. These

circumstances do not support any inference of retaliatory motive on their part.

    As for Holbrook's claim against Unit Manager Walters, I find that Holbrook has

presented sufficient evidence to withstand summary judgment on the causation prong of a

prima facie case of retaliation.  Viewing the record as a whole in favor of Holbrook, it could be

found that his constitutionally protected right of filing institutional complaints was a substantial

motivating factor in Walters' decision to seek his confinement in AC.[7]   The record reveals that

---

[7]  Holbrook has not presented sufficient evidence of a causal relationship between his affiliation with the NOI and his placement in AC and eventual transfer.  Walters was aware of

(continued...)

Walters suspected Holbrook of orchestrating a complaint campaign against CO Blattenberger.

Walters then allegedly verbalized his dismay with Holbrook's actions to Plaintiff and other

inmates.  Walters allegedly threatened to send whomever was involved in the OPR complaint

"under for a long time."  (Dkt. Entry 92, Holbrook's Declaration.)  Holbrook offers the

declarations of three inmates whom Walters allegedly confronted regarding the question of

Holbrook's involvement in prompting or assisting them to file grievances against CO

Blattenberger.  These three inmates state that after Walters confronted them about his

suspicions as to Holbrook's involvement in their decision to file a complaint against CO

Blattenberger, they were all transferred from SCI-Huntingdon to other facilities at Walters'

request.  (Dkt. Entry 94, Exhs. 6, 7 and 9.)

        Holbrook has thus tied his placement in AC and eventual transfer to statements

by Walters that, if believed, could support an intent to retaliate for complaining about CO

Blattenberger.  This evidence is sufficient to preclude summary judgment on the causation

question.

---

[7](...continued)
Holbrook's membership in the NOI upon his arrival at SCI-Huntingdon in April 2000.  Walters
did not recommend Holbrook's RHU confinement until June 21, 2002.  There is no evidence
that Plaintiff's religious affiliation had anything to do with Walters' actions at that time.  The fact
that there is no evidence of any antagonism between Walters and Plaintiff prior to the
submission of the OPR claim precludes any inference of an intent to punish Holbrook because
of his religious affiliation.  Moreover, the timing of the adverse action cannot serve as
circumstantial evidence of Walters' alleged motive to retaliate against Holbrook on that basis.
See Rauser, 241 F.3d at 334.

The genuine dispute of facts that precludes adjudication of the causation question, however, does not necessarily preclude a ruling in favor of Walters at the summary judgment stage.  See Sims v. Vaughn, 189 Fed. Appx. 139, 141 (3d Cir. 2006); Alexander, supra, 2006 WL 2796412, at *2.  Walters is entitled to summary judgment if the record discloses no genuine issue of fact material to the issue of whether he would have taken the same action regardless of a motive to retaliate.

For example, in Carter, 292 F.3d 154-59, our Court of appeals affirmed summary judgment in favor of a prison official after assuming that the prisoner plaintiff had established a prima facie case of retaliation.  The court found that, in light of the substantial evidence of the prisoner's misconduct that resulted in a disciplinary sanction that Carter alleged to be retaliatory, there was "no genuine issue of material fact that such action was 'reasonably related to legitimate penological interests,' and that Carter would have been disciplined notwithstanding his [exercise of protected rights]."  Id. at 159.

Given Holbrook's sudden interest in a security override to work in a sensitive area of the institution, combined with his long standing refusal to work, his reputed involvement as an officer in the FOI, his long history of aggressive behavior, his poor institutional adjustment, and what appeared to be an interest in being associated with the "American Taliban," Walters believed it prudent to advise security staff of Holbrook's actions.  (Walters Decl. at ¶ 22.)  Walters urged security staff to "place this inmate under the microscope, monitor

his calls and mail more closely, investigate him, contact outside agencies for additional date or

place him under Administrative Custody for more control." (Dkt. Entry 94, Exh. 13, Walters'

June 21, 2002, Memo.)  Although Holbrook disputes the facts underlying his institutional record,

there is no dispute as to the contents of his record.  Nor is there any dispute that Walters had

access to Holbrook's institutional record.  His record includes reports of numerous assaults and

attempted assaults, many of which led to his placement in AC even though he was not given a

misconduct.  Notably, several of the incidents to which Holbrook has been linked involved

concerted conduct of Plaintiff and other inmates alleged to be members of the FOI.  Holbrook

does not deny that a homemade weapon was found hidden in his cell, rather he disclaims

ownership of the weapon.  While Holbrook discounts the severity of his repeated rules

infractions, he cannot deny that he did knowingly break institutional rules for  unauthorized

correspondence with inmates at different facilities; introduction of drugs into the prison; theft;

presence in unauthorized areas; and refusal to obey orders.  Holbrook was identified as a high

security risk within the DOC prior to arriving at SCI-Huntingdon or Walters' June, 2002 memo.

The DOC has transferred him on more than one occasion for the protection of others.  The list

of inmates, and now staff, that he must be separated from substantially limits the DOC's ability

to transfer him to a facility where he may be placed in a general population setting.

        As Holbrook's unit manager, Walters was the staff member responsible for being

familiar with Plaintiff's past institutional history, as well as his day-to-day activities within SCI-

Huntingdon.  When Holbrook behaved in what Walters' perceived to be an unusual manner by suddenly requesting a security override so he could work in the institution's powerhouse, Walters understandingly became suspicious.  Prior to writing his June 2002 memo, Walters spoke with at least one corrections officer on his block (Hiquet) and the Unit Counselor (Lovett) to learn more.  His preliminary investigation raised only more concerns as it revealed that it was believed that Holbrook had been promoted to the rank of Major within the FOI and was extorting money and goods from inmates on the unit as well as telling other inmates he was in the American Taliban.  True or not, Walters had an obligation and duty to bring these matters to the attention of the security staff.  He simply recommended that Holbrook be placed on AC status.  He did not, and could not, unilaterally direct Holbrook's long term confinement under AC status.  Nor could he direct that Holbrook be transferred to another facility.[8]  Walters simply raised his concerns to security personnel.  Holbrook offers no evidence as to why Walters should not have relied on his record of poor institutional adjustment, suspected involvement with the FOI, or reports from unit staff as to what other inmates were saying about his recent FOI rank or activities.  Given the heightened concerns of prison administrators of the possible

---

[8] Holbrook points to evidence that contradicts Walters' assertion that a transfer had been recommended by OPR in order to separate Plaintiff from Walters based upon allegations Holbrook had made against Walters.  Specifically, he relies upon a letter dated March 10, 2003 from OPR to his mother.  (Plf's Exh. 27, Dkt. Entry 94.)  The dispute as to whether OPR requested the transfer or whether it was initiated by Walters is not material to the outcome of this case.  What is material is the fact that DOC Central Office perceived a need to separate Holbrook from Walters, and thus approved the transfer.

"recruitment of inmates in American prisons by radical Islamic groups," in conjunction with

Holbrook's institutional history of suspected FOI involvement and his documented willingness to

engage in assaultive and aggressive behavior, Walters' act of notifying security officials as to

his suspicions was reasonably related to legitimate penological interests.[9]

Contrary to Holbrook's contention, Walters' actions cannot be dismissed as an

exaggerated response to an otherwise simple request for a change in security classification.

The fact that Walters could keep Holbrook out of the powerhouse position by denying the

request to lower his custody classification does not mean that Walters did not have a

reasonable basis for suspecting that Holbrook may be up to something sinister.  Moreover, it is

not this Court's prerogative to circumscribe a prison official's handling of security-related

incidents.  As our Court of Appeals explained in rejecting a similar argument that prison officials

could have taken less restrictive action to address a security concern:

> "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison
> administration and reform." [ *Procunier v. Martinez,* 416 U.S. 396, 405 (1974).]
> As the *Martinez* Court acknowledged, "the problems of prisons in America are
> complex and intractable...." *Id.*, at 404-05. Running a prison is an inordinately
> difficult undertaking that requires expertise, planning, and the commitment of
> resources, all of which are peculiarly within the province of the legislative and
> executive branches of government. Prison administration is, moreover, a task
> that has been committed to the responsibility of those branches, and separation
> of powers concerns counsel a policy of judicial restraint. Where a state penal

---

[9]  I note that Walters was not the first of Holbrook's Unit Managers to report their
concerns as to Holbrook's assaultive potential to security.  See Watlers Decl. at Exhibit G,
Attempted Assault Memo from Unit Manager Smeal to Acting Captain Tomer.

system is involved, federal courts have, as we indicated in *Martinez*, additional
reason to accord deference to the appropriate prison authorities. *See id.*, at 405.

To these observations, we would add that a measure of deference is especially
appropriate when a regulation implicates prison security.

Fraise v. Terhune, 283 F.3d 506, 516 (3d Cir. 2002).  Indeed, "'[p]rison administrators should

be accorded wide-ranging deference in the adoption and execution of policies and practices

that in their judgment are needed to preserve internal order and discipline and to maintain

institutional security."  Carter, 292 F.3d at 158, quoting Bell v. Wolfish, 441 U.S. 520, 547

(1979).  The mantle of the First Amendment does not provide protection for prisoners to

engage in dangerous or disruptive activities, or tie the hands of experienced prison

administrators burdened with maintaining a safe and secure facility, simply by claiming

retaliation.  Rauser, supra.

Finally, I note that, contrary to Holbrook's assertions, Walters did not have the

ability or authority to place Holbrook in the AC for an extended period of time or to effectuate

his transfer based on his say so alone.  Walters presented his security concerns to the PRC,

which was comprised of individuals who were not involved in the Blattenberger grievance/OPR

matter.  Further, neither Superintendent Kyler nor the PRC possessed the necessary authority

to transfer Holbrook to another facility without the approval of DOC's Central Office.  As

reflected by the findings of the Office of Professional Responsibility as to Holbrook's complaint

against Blattenberger and Walters, "[t]he information obtained during this investigation revealed

that the PRC, Counselor Lovett, Superintendent Kyler and Secretary of Corrections Jeffrey

Beard all concurred with Unit Manager Walters' recommendation that Holbrook remain in the

RHU on AC status pending a transfer to the LTSU because he's definitely a threat to any

institution security." (Dkt. Entry 94, Exh. 24.)  Walters' recommendations as to Holbrook's AC

placement was reviewed at various levels of the DOC hierarchy.  All those reviewing Holbrook's

file reached the same conclusion – his continued presence at SCI-Huntingdon created a

security threat.  The fact that the reason for the transfer included the tension created by

Holbrook asserting an unsubstantiated charge of wrongful conduct by Walters only reinforces

the conclusion that the transfer was animated by legitimate penological concerns.

        The undisputed facts of record compel a conclusion that there was a rational

basis related to legitimate penological interests for the actions taken by Walters.  Moreover, the

substantial deference to be accorded prison officials in matters of institutional security leaves

no doubt that Walters would have taken the same action absent Holbrook having engaged in

protected activity.  Holbrook has not come forward with evidence from which a trier of fact could

reasonably conclude that the non-retaliatory reasons proffered by Defendants are not worthy of

belief.  Plaintiff's conclusory allegation that Walters singularly, or the Defendants as a whole,

retaliated against him by manufacturing a reason to place him in AC, and hold him there

pending an administrative transfer, is insufficient to show that the reasons proffered by

Defendants were pretextual.  Likewise, Holbrook's transfer, based on the need to separate him

from Walters, was not made by Walters, but rather at the recommendation of the PRC.  A separation transfer to isolate a particular inmate from a staff member is the type of decision that is within the "broad discretion" that must be accorded prison officials when dealing with a high security inmate, such as Holbrook.

**V.        Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ROBERT L. HOLBROOK,                          :
                                             :
                  Plaintiff,                 :
                                             :   CIVIL NO. 3:CV-03-0033
         v.                                  :
                                             :   (JUDGE VANASKIE)
SCOTT WALTERS, ET AL.,                       :
                                             :
                  Defendants.                :

O R D E R

NOW, **this 4th day of April, 2007,** for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

    1.      Defendants' Motion for Summary Judgment (Dkt.
            Entry 79) is **GRANTED**.

    2.      The Clerk of Court is directed to enter judgment in
            favor of all Defendants and to mark this matter
            **CLOSED.**

                                    s/ Thomas I. Vanaskie
                                    Thomas I. Vanaskie
                                    United States District Judge